*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



★ ★ ★       ★ ★ ★

# OPINION

No. 04-10-00041-CV

**DYNEGY**, Inc.,
Appellant

v.

Terry W. **YATES**, Individually, and Terry W. Yates, P.C.,
Appellees

From the 127th Judicial District Court, Harris County, Texas
Trial Court No. 2005-37892
Honorable Sharolyn P. Wood, Judge Presiding

**OPINION ON APPELLEES' MOTION FOR REHEARING**

Opinion by:    Phylis J. Speedlin, Justice

Sitting:        Catherine Stone, Chief Justice
               Phylis J. Speedlin, Justice
               Marialyn Barnard, Justice

Delivered and Filed: February 23, 2011

REVERSED AND RENDERED

The panel, on its own motion, has reconsidered the motion for rehearing filed by appellees, Terry W. Yates, Individually, and Terry W. Yates, P.C., on June 30, 2010, and has determined that its analysis of the statute of frauds issue in its opinion dated August 25, 2010 is erroneous. Accordingly, this court's opinion and judgment dated August 25, 2010 are withdrawn, and this opinion and judgment are substituted.

Dynegy, Inc. appeals the trial court's judgment in favor of Terry W. Yates, Individually, and Terry W. Yates, P.C. (collectively "Yates") for fraud arising out of an oral contract for the payment of attorney's fees. Among other issues on appeal, Dynegy asserts the judgment must be reversed because of insufficient evidence to support the jury finding of fraud in the formation of an oral contract for attorney's fees. Because we hold the evidence is legally insufficient, we reverse the trial court's judgment based on the jury's fraud finding and render judgment on the jury's findings on the alternative theory of breach of contract.

### FACTUAL AND PROCEDURAL BACKGROUND

On June 10, 2003, Jamie Olis, a former officer of Dynegy, was indicted on multiple counts of securities fraud, mail and wire fraud, and conspiracy arising out of Olis' work on a complex financing transaction known as "Project Alpha" while he was Senior Director of Tax Planning in Dynegy's Tax Division. Pursuant to its articles of incorporation, the Dynegy Board of Directors passed a resolution in October 2002 that authorized the advancement of attorney's fees and expenses to certain officers and directors, including Jamie Olis, who were under investigation for their roles in Project Alpha. The resolution stated in relevant part that reasonable legal expenses arising out of Project Alpha were to be advanced to Olis upon receipt of (i) a signed statement that he had acted in good faith and in the corporation's best interests, with no reasonable cause to believe his conduct was unlawful, and (ii) a signed undertaking to repay the legal expenses if the Board ultimately determined he did not meet the standard of conduct required for indemnification. The Board resolution also provided, "such approval may be modified or revoked by this Board at any time as a result of changes in circumstances or further analysis." Olis signed the written undertaking in

January 2003, and agreed to repay his legal expenses if it was determined he did not meet the indemnification standard.

Ten days after his indictment, on June 20, 2003, Olis hired criminal defense attorney Terry W. Yates to defend him in the federal criminal prosecution and in the on-going civil investigation conducted by the Securities and Exchange Commission ("SEC"). Olis told Yates, and his associate Mark Clark, that Dynegy would be paying his legal fees. That day, Clark called Cristin Cracraft, an attorney in Dynegy's legal division, to confirm that Dynegy would pay Olis' legal fees and to discuss the payment procedure. During the phone call, Clark told Cracraft that Olis had hired Yates to represent him and asked for confirmation that Dynegy was paying Olis' legal expenses. Clark testified that Cracraft stated, "the Board has passed a resolution, so, yes, we are paying Jamie Olis' fees," and instructed Clark that the bills should be submitted to her. Cracraft stated the hourly rates, however, should be negotiated with Olis because he was Yates' client, not Dynegy. Cracraft's trial testimony about her conversation with Clark was consistent with Clark's version.

Yates testified that he made an oral agreement with Olis that he (Yates) would look solely to Dynegy for payment of his fees for representing Olis. Olis signed a written fee contract with Yates on June 20, 2003 specifying the hourly rates to be charged and agreeing that he (Olis) was financially responsible for payment of Yates' legal fees. Although Dynegy's name is not mentioned, the written contract contains a phrase stating "all fees are due when billed *unless other specific arrangements have been made*." At trial, Yates testified this modifier was intended to refer to the fact that Dynegy was paying Olis' fees because Yates orally agreed with Olis never to look to him for payment of the legal fees. Yates further testified that he called Cracraft on June 20, 2003, after he faxed her the written fee contract signed by Olis which showed the hourly rates to be charged.

Yates stated that Cracraft confirmed that she received the fax and told him that Dynegy would pay Olis' legal fees directly to Yates through trial. Cracraft contradicted Yates' testimony about the phone call, however, stating that she never spoke to Yates on the phone that day, and in fact had never spoken to or met Yates as of the date of trial. Finally, Yates testified that he relied on Cracraft's oral promise that Dynegy would pay Olis' legal fees directly to Yates through trial.

On August 13, 2003, Dynegy hand-delivered a letter to Yates, addressed to Olis, stating that it would directly pay Yates his legal fees billed through August 17, 2003; after that date, Dynegy would pay the fees into an escrow account pursuant to a July 23, 2003 Board resolution. Dynegy paid Yates' June invoice for $15,000 within two weeks of its submission, but then mistakenly escrowed the $105,000 for Yates' July invoice; it was paid in November 2003 after Olis' criminal trial ended. Yates submitted a third and final invoice for $448,556, representing all work performed from August 2003 through April 2004, including the November 2003 trial. Dynegy initially escrowed that amount, but later rejected payment of Yates' third invoice.

Yates filed suit against Dynegy to recover his unpaid attorney's fees.[1] Yates alleged breach of contract and fraudulent inducement and sought benefit-of-the-bargain damages for both claims. After a three-week trial, a jury found in favor of Yates on both his breach of contract claim and his fraud claim, awarding him (a) $448,556 in actual damages for breach of contract plus $574,718 in attorney's fees through trial (plus appellate fees), and (b) $500,000 in actual damages for fraud plus $2 million in punitive damages. Yates elected to recover under his fraud claim. On May 25, 2007, the trial court entered judgment in favor of Yates for $500,000 in actual damages, plus pre-judgment

---

[1] Olis separately sued Dynegy in *Olis v. Dynegy Holdings, Inc., et al.*, Trial Court No. 2006-CI-12424, in the 57th Judicial District Court, Bexar County, Texas, alleging breach of contract and tort claims arising from Dynegy's alleged breach of its indemnification obligation owed to Olis. That case was transferred to Harris County.

interest, and $2 million in punitive damages, plus costs of court and post-judgment interest. Dynegy now appeals.

### STATUTE OF FRAUDS

We begin our analysis by examining whether the statute of frauds bars enforcement of the oral contract. The statute of frauds requires that certain types of promises or agreements, such as a promise by one person to pay the debt of another, be in writing and signed by the party to be charged. TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(2) (West 2009). Generally, whether a contract falls within the statute of frauds is a question of law. *Bratcher v. Dozier*, 162 Tex. 319, 346 S.W.2d 795, 796 (1961); *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 149 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). We review questions of law de novo. *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex. 1999); *Rittmer v. Garza*, 65 S.W.3d 718, 722 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

Dynegy argues the judgment below should be reversed and rendered because the oral agreement between Yates and Dynegy was to answer for the debt of a third person, i.e., Jamie Olis, and therefore is unenforceable under the statute of frauds. Dynegy notes that Yates failed to plead an exception to the statute of frauds, and failed to secure jury findings establishing an applicable exception to the statute of frauds. *See Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 705 (Tex. App.—Houston [1st Dist.] 1988, writ denied) (whether exception to statute of frauds applies is generally question of fact); *see also Otto Vehle & Reserve Law Officers Ass'n v. Brenner*, 590 S.W.2d 147, 152 (Tex. Civ. App.—San Antonio 1979, no writ) (same). Therefore, Dynegy asserts that both Yates' fraud claim seeking benefit-of-the-bargain damages and his alternative breach of contract theory are barred. Yates responds that the statute of frauds does not preclude his claims

because: (1) Dynegy failed to meet its burden to prove the statute of frauds applies when it did not seek summary judgment or a directed verdict, or submit a jury question, on that issue; (2) Dynegy's promise to pay Yates' legal fees as they were incurred was not a promise to answer for the debt of another; (3) the contract was completely performed by Yates; and (4) the oral contract was performed within one year.

The first question we must address is whether Dynegy met its burden of proof on its affirmative defense of the statute of frauds. Yates argues that Dynegy failed to meet its burden when it did not move for summary judgment or a directed verdict on that ground, and did not submit a jury question on the statute of frauds. We agree that statute of frauds is an affirmative defense which is waived if not pleaded. *See* TEX. R. CIV. P. 94; *Phillips v. Phillips*, 820 S.W.2d 785, 791 (Tex. 1991). In addition, the party pleading the statute of frauds bears an initial burden to establish its applicability. *Brenner*, 590 S.W.2d at 152. We disagree, however, that a motion for summary judgment or directed verdict is required. Here, Dynegy pled the affirmative defense of the statute of frauds in its answer, and moved for judgment notwithstanding the verdict on the basis of the statute of frauds, thereby preserving it as a ground for judgment as a matter of law. TEX. R. CIV. P. 301; *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992).

We next examine whether the oral contract was a promise by Dynegy to pay Olis' debt. It is a well-settled rule of law that if services are performed for one party upon the promise of another to pay for the services, then the promisor is not liable for the debt of another, but for his own obligation. *Kinney v. Pearce*, 65 S.W.2d 502, 503 (Tex. Civ. App.—Beaumont 1933, no writ); *Evans v. Shaw*, 268 S.W. 1037, 1038 (Tex. Civ. App.—Waco 1925, no writ) ("Wherever the main purpose and object of the promisor is, not to answer for another, but to subserve some purpose of

his own, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the liability of another."). A distinction must be drawn between a promisor's primary obligation, which escapes the prohibitions of the statute of frauds, and a collateral obligation that does not. *Shahan-Taylor Co. v. Foremost Dairies, Inc.*, 233 S.W.2d 885, 888 (Tex. Civ. App.—San Antonio 1950, writ ref'd n.r.e.). In determining whether Dynegy was bound to a primary or secondary obligation, the intention of the parties must be examined. *See id.*; *see also Morris v. Carter*, 261 S.W.2d 614, 616 (Tex. Civ. App.—Dallas 1953, writ ref'd n.r.e.). The intention of the parties may be determined by considering all of the surrounding facts and circumstances, including: (1) the words and expressions used by the parties; (2) the parties' acts and conduct; (3) whether the services were rendered before or after the promise; (4) the manner in which the seller carried the account on his books; (5) the manner in which payments were made; (6) the purpose of the agreement; and (7) the promisor's interest in the transaction. *See Shahan-Taylor*, 233 S.W.2d at 888; *Morris*, 261 S.W.2d at 616. "Unconditional and undisputed facts in many instances are enough to show, as a matter of law, either an oral, contemporaneous, unconditional promise to perform the obligation of a contract, on the one hand, or, on the other, that credit is given a debtor with another promisor as surety of guarantor, creating only a collateral agreement." *Shahan-Taylor*, 233 S.W.2d at 889.

In *Banfield v. Davidson*, the court examined a promise to pay for services rendered to another and held the promise was an original undertaking or primary obligation. *Banfield v. Davidson*, 201 S.W. 442, 443 (Tex. Civ. App.—Galveston 1918, no writ). In that case, J.A. Banfield was driving a vehicle that struck and injured Johnny Van. *Id.* at 442. Banfield brought Van to a hospital owned by Dr. G.L. Davidson. *Id.* Davidson subsequently sued Banfield to recover the costs of the services

provided to Van. *Id.* Davidson alleged that Banfield promised to pay Davidson for his services to Van before any services were undertaken, performed, or rendered. *Id.* Banfield denied making any such promise. *Id.* A jury found that Banfield promised to pay for the services and awarded Davidson damages. *Id.* at 443. On appeal, Banfield asserted the trial court erred in refusing to instruct the jury that a person cannot be liable upon a promise to answer for the debt of another unless the agreement is in writing. *Id.* at 443. The appellate court held that Banfield's agreement was an original undertaking, noting, "[t]here is no contention by either party that it is alleged in the pleadings of either party or shown by the evidence that the medical services or hospital accommodation given to Johnny Van were first performed, and thereafter a promise was made by appellant to pay the reasonable value for such services, etc." *Id.* Accordingly, the court concluded the cause of action alleged and proven was not subject to the statute of frauds. *Id.*

Similarly, in *Kinney*, H.G. Pearce sued Cleveland Kinney alleging that he sold goods to William and Eugene Dempsey based on Kinney's promise to pay for the goods. *Kinney*, 65 S.W.2d at 502-03. Kinney denied making the promise and also asserted the oral promise was to answer for the debt of another and not enforceable under the statute of frauds. *Id.* at 503. A jury found that Kinney agreed to pay Pearce for the goods. *Id*. On appeal, Kinney asserted the jury should have been asked about the timing of Kinney's agreement to pay for the goods. *Id.* The appellate court overruled this assertion, noting the evidence was undisputed that the promise was made before the goods were sold. *Id.* The court concluded, "[u]nder the finding of the jury, the promise of appellant was an original undertaking, and not collateral, and therefore the statute of frauds did not apply." *Id.*

Finally, in *Evans*, a physician rendered services for the appellant's adult son and his son's wife. *Evans*, 268 S.W. at 1037. The charges for those services amounted to $102. *Id.* When the son again became ill, the physician informed appellant that he would not treat the son any further unless the appellant agreed to pay for both the new services and the prior charges. *Id.* The physician alleged the appellant promised to pay for the services to be performed and the prior charges, which the appellant denied. *Id.* A jury found the appellant agreed to pay for the services and awarded the physician $188 ($102 for the prior charges and $86 for the new services performed). *Id.* On appeal, the appellant asserted that the physician was not entitled to recover based on the statute of frauds. *Id.* at 1038. As to the $86 for the new services performed, the appellate court held that the services were performed only after the appellant promised to pay for them; therefore, "appellant's obligation to pay was an original primary obligation." *Id.* The court applied a different analysis to the $102 since the debt was pre-existing at the time appellant promised to pay it. *Id.* at 1038-39.

In *Bledsoe v. Pritchard*, the appellate court explained the difference between a primary obligation and a collateral obligation. *Bledsoe v. Pritchard*, 107 S.W.2d 742 (Tex. Civ. App.—Amarillo 1937, no writ). One of the issues raised on appeal was whether the statute of frauds barred the recovery of damages for boarding services provided to LaVerne and Elise Owenbey, who were the nieces of the appellant, Sallie Pritchard, and the daughters of Joe Owenbey. *Id*. at 742-43. The court reasoned:

> We think it is well settled that the plaintiff would have been obligated to pay the defendants for this board bill if she had agreed to do so unconditionally and the girls had been accepted in the home of defendants under such understanding. If the plaintiff had so promised and the defendants had relied thereon, it would have become plaintiff's own obligation and debt and not that of her brother or nieces, and therefore would not have come within the statute of frauds. [internal citations omitted]. In the present case, however, the defendants admitted on cross-examination

> they were looking to Joe Owenbey primarily for this obligation, and that if he did not pay the debt, then Mrs. Pritchard was expected to do so. The defendant R.H. Bledsoe testified that Mrs. Pritchard promised to pay the debt if Owenbey did not. Such a conditional promise, we think, would bring the alleged promise within the statute of frauds. . . .

*Id.* at 744; *see also Morris*, 261 S.W.2d at 616 (promise to pay for repairs to a third party's car was not subject to statute of frauds where promise was made before the repairs were undertaken); *Shahan-Taylor*, 233 S.W.2d at 889 (promise by dairy to pay for feed delivered to owner of dairy herd held to be primary obligation not subject to statute of frauds). *But see Kothmann v. Hall*, No. 03-09-00081-CV, 2010 WL 2789805, at *4 (Tex. App.—Austin Jul. 15, 2010, no pet.) (mem. op.) (foundation's verbal approval of assistance to applicants in need of orthodontic services was not an assumption of the primary obligation but was, at most, a promise to answer for debt of another person subject to statute of frauds).

Looking beyond Texas cases to the Fifth Circuit, we find *Pravel, Wilson & Matthews v. Voss*, 471 F.2d 1186 (5th Cir. 1973), to be instructive. In that case, a stockholder of a company consulted a lawyer regarding a patent infringement suit. *Id.* at 1187. The lawyer agreed to take the case but sought assurance that his law firm would be paid for its services. *Id.* at 1187-88. The stockholder referred the lawyer to the president of the company, who told the lawyer to "go for broke" and that he would "take care" of the fee. *Id.* at 1188. Subsequently, the president was held personally liable for the unpaid fees. *Id.* On appeal, the president asserted that he promised only to guarantee payment by the company and, since the promise was not in writing, its enforcement was barred by the statute of frauds. *Id.* The Fifth Circuit rejected this argument. *Id.* The Fifth Circuit reasoned that the president's promise was not to answer for the debt of the company, but was a promise that

he would personally pay the fees for the services rendered to the company in the patent infringement suit. *Id.* at 1189. As a result, the Fifth Circuit concluded the statute of frauds was simply inapplicable. *Id.*

In the instant case, Dynegy promised to pay for the legal services that Yates was to provide Olis. The promise was made before the services were undertaken. Dynegy's Board of Directors approved payment for Olis' legal services because Olis was an officer of the company and was under investigation for actions taken in connection with his work for the company on Project Alpha, which was a transaction structured to provide substantial benefits to Dynegy. A Dynegy attorney told Yates and Clark to submit the bills directly to Dynegy, and Dynegy began paying the bills as they were submitted. The jury found that Dynegy agreed to pay Yates for his services. Under these facts and circumstances, we hold as a matter of law that Dynegy's promise was a primary obligation and not the promise to pay the debt of another. Accordingly, the statute of frauds is inapplicable and does not bar Yates' recovery for breach of the oral contract.[2]

### LEGAL SUFFICIENCY OF THE EVIDENCE - FRAUD FINDING

Dynegy asserts the evidence is legally insufficient to support the jury's finding that it committed fraud against Yates. Specifically, Dynegy asserts there is "no evidence" of fraud because: (1) one corporate actor's statement/representation may not be "mixed and matched" with another corporate actor's knowledge or intent to prove that the corporation committed fraud; (2) subsequent events occurring after formation of the contract may not be used to prove fraudulent inducement of the contract; (3) speculative evidence or a series of inferences does not constitute any evidence of

---

[2] Because we hold that the statute of frauds is inapplicable to Dynegy's promise to pay for Yates' legal services, we need not address the potential applicability of any exceptions to the statute of frauds.

fraud; and (4) there is no evidence of Yates' actual, justifiable reliance on the alleged fraudulent statements by Dynegy in the August 13, 2003 escrow letter, given the unambiguous writing.

Yates responds that, when combined with Dynegy's breach of the oral fee contract, there is sufficient circumstantial evidence of an intent not to perform by Dynegy on June 20, 2003 to uphold the jury's fraud verdict. *See Huynh v. Phung*, No. 01-04-00267-CV, 2007 WL 495023, at *4 (Tex. App.—Houston [1st Dist.] Feb. 16, 2007, no pet.) (mem. op.) (slight circumstantial evidence of fraud in combination with failure to perform as promised is legally sufficient to support finding of fraudulent intent). In his brief, Yates disclaims any separate reliance on the August 13, 2003 escrow letter as a separate fraud, stating that it was simply a "continuation of the fraud already begun." Yates relies solely on the oral promise by Cracraft on June 20, 2003 to support the fraud finding based on fraudulent inducement, asserting that "the fraud was . . . the misrepresentation that Dynegy would pay the legal bills directly to Yates as incurred." Therefore, our review of the record and analysis focuses on whether the elements of fraudulent inducement were present at the time of the June 20, 2003 oral agreement between Cristin Cracraft and Mark Clark, and Cracraft and Terry Yates.

**Additional Background Facts**

***Dynegy's Articles of Incorporation***

Dynegy was an Illinois corporation during the period in question. Illinois law authorizes a corporation to advance legal fees to its officers and directors under certain circumstances. 805 ILL. COMP. STAT. 5/8.75(e) (permitting advancement in corporation's discretion). Article 7(1)(D) of Dynegy's amended articles of incorporation permits the corporation to advance reasonable legal expenses incurred by officers and directors in a civil or criminal proceeding upon certain terms and

conditions. One such condition is the execution by such officer or director of a statement that he "acted in good faith and in a manner which he believed to be in, or not opposed to the best interests of the Corporation," and an undertaking to repay the legal expenses if it is ultimately determined that he is not entitled to indemnification. Section D further provides that the Dynegy board of directors may by resolution provide for securing the payment of authorized advances by creating escrow accounts with such restrictions as the Board deems appropriate. Section A of Article 7(1) provides that

> the Corporation shall indemnify any person who was or is a party . . . to any . . . action, suit or proceeding, whether civil, criminal, administrative or investigative . . . by reason . . . that he is or was a director or officer of the Corporation . . . against expenses (including attorneys' fees) . . . if he acted in good faith and in a manner he reasonably believed to be in or not opposed to be [sic] the best interests of the Corporation, and, with respect to any criminal action or proceeding, has no reasonable cause to believe his conduct was unlawful.

### *October 2002 Board Resolution Approving Payment of Olis' Attorney's Fees*

On October 18, 2002, the Dynegy board of directors passed a resolution under the authority of Article 7(1)(D) that authorized the advancement of attorney's fees and expenses to certain officers and directors, including Jamie Olis, who were under investigation for their roles in Project Alpha. The resolution stated in relevant part that reasonable legal expenses arising out of Project Alpha were to be advanced to Olis "in advance of the final disposition of such action" upon receipt of (i) a signed statement that he had acted in good faith and in the corporation's best interests, and (ii) an undertaking to repay the expenses "if it shall ultimately be determined that he . . . did not meet the standard of conduct required for indemnification by Dynegy." The resolution also contained a condition that, "***such approval may be modified or revoked by this Board at any time as a result of changes in circumstances or further analysis***." In January 2003, Olis signed the written

undertaking representing that he had acted in good faith and agreed to repay the advanced legal expenses if it was determined he did not meet the indemnification standards. In March 2003, Olis was terminated and received a severance. Olis signed a letter agreement stating he would continue to cooperate with the Project Alpha investigations.

### *Dynegy's Discussions with U.S. Attorney about "Cooperation"*

Also in January 2003, Dynegy's CEO, Bruce Williamson (who had taken over as CEO in October 2002), received a letter from the Assistant United States Attorney Jimmy Sledge advising him of the government's concern that "Dynegy's 'cooperation' is more apparent than real." Williamson and Dynegy's outside counsel met with the U.S. Attorney for the Southern District of Texas, Michael Shelby, to discuss Dynegy's cooperation with the investigation. Williamson pledged Dynegy's "full cooperation," understanding that the corporation would be indicted, and forced to shut down as a result, if it did not fully cooperate. A January 17, 2003 letter from Shelby memorializes Williamson's pledge of "full cooperation" on behalf of Dynegy; Williamson had to provide all documents requested, without redaction, and waive the corporation's attorney/client privilege in order to be "in cooperation."

On January 20, 2003, the Thompson Memo concerning criminal prosecution of corporations was issued to all U.S. Attorneys. The Thompson Memo stated that, in determining whether to indict a corporation, the prosecutor should consider the corporation's "willingness to cooperate," and that part of the "cooperation" analysis includes whether the corporation is advancing attorney's fees to culpable employees. The U.S. Attorney had the Thompson Memo hand-delivered to Williamson at Dynegy. Williamson testified that before he arrived in October 2002 the Board had authorized direct payment of legal fees for those employees under investigation. Williamson stated that sometime in

the spring of 2003, the government made clear that payment of the legal fees was a factor that conflicted with a corporation's "full cooperation" under the Thompson Memo. Subsequently, in March and May 2003, respectively, Dynegy advised two of the non-officer employees targeted in the Project Alpha investigation, Richard Gould and Helen Sharkey, that it would no longer pay their legal expenses for the criminal investigation. Cristin Cracraft drafted the May 2003 letter to Sharkey terminating payment of her attorney's fees.

### *Olis Hires Yates on June 20, 2003*

Olis was indicted on June 10, 2003 for securities fraud, mail fraud, wire fraud and conspiracy, along with his boss Gene Foster and Sharkey. Both Sharkey and Foster ultimately pled guilty; only Olis proceeded to trial. Olis decided to change attorneys after his indictment, and hired Terry Yates to represent him in the federal criminal investigation, as well as the on-going SEC criminal investigation. Olis told Yates, and his associate Mark Clark, that Dynegy would be paying his legal fees and Yates agreed to look solely to Dynegy for payment. At trial, Yates testified that he relied on Cracraft's oral promise made to both Clark and Yates that Dynegy would pay Olis' legal fees directly to Yates through trial; contrary to his usual practice, Yates did not request a retainer from Olis. Further, Yates stated he knew that once he appeared on behalf of Olis in federal court, the judge would have to consent to any withdrawal.

### *Partial Payment of Yates' Legal Fees*

Dynegy paid Yates directly within two weeks of his first invoice for June 2003 work. Yates' July invoice for $105,000 was not immediately paid; Yates delayed its submission until October 2, 2003 because he had seen his prior bill in the Dynegy documents at the U.S. Attorney's office. The $105,000 for Yates' second bill was placed into a Dynegy escrow account pursuant to the July 23

Board resolution modifying the advancement procedure for Olis' legal fees to require they be placed in escrow. Cracraft testified she mistakenly put the $105,000 in escrow, instead of paying it directly to Yates, because she did not realize the bill was for work done during July. Olis' federal criminal trial was held in November 2003, resulting in his conviction on all counts. The $105,000 was ultimately paid to Yates in November, after Olis' trial was over. In April 2004, Yates submitted his third and final invoice for $448,556, covering all work performed from August 2003 through April 2004; Dynegy placed that amount in the escrow account pending the Board's ultimate determination as to whether Olis had acted in "good faith" while employed at Dynegy. Olis appealed his conviction and sentence of 24 years. The Fifth Circuit affirmed Olis' conviction but remanded for resentencing, at which Olis received a sentence of six years. After Olis' conviction was final, Dynegy's Board determined in March 2007 that he had not acted in good faith and that Dynegy was not obligated to indemnify him or to release the escrowed $448,556 in attorney's fees. Subsequently, Yates sued Dynegy for fraud and breach of the oral contract to pay his attorney's fees.

### Trial on Yates' Unpaid Attorney's Fees

At the trial on Yates' fraud and breach of contract claims, a series of emails between Dynegy CEO Williamson and Shelby were introduced. One email exchange is dated June 13, 2003, prior to Cracraft's oral fee agreement with Clark/Yates on June 20, 2003; it is a cordial exchange with general references to Dynegy's cooperation with the investigation but contains nothing regarding Dynegy's payment of its employees' legal fees. About one month later, on July 18 and 19, 2003, Williamson and U.S. Attorney Shelby exchanged a series of emails about Dynegy's advancement of legal expenses for its employees under investigation. Williamson stated to Shelby that, "I am totally supportive of trying to modify our legal support posture. I have wanted to do so for some

time." Shelby replied, "Thanks for looking into this. I think it [sic] in neither of our interests to have the company pay for the defense of individuals whose actions were so egregious." Williamson responded, "I actually have been pushing it for about 6 months. Your actions give me 'probable cause' to change." Williamson sent another email to Shelby in the afternoon on July 19 stating, "I just reviewed and approved a board resolution to change the process . . . I am no[t] paying for Sharkey as it is so this impact is to Foster and Olis." Finally, in the early evening on July 23, 2003, Dynegy's outside counsel sent Shelby an attachment email stating, "Attached is the Board resolution passed today that was the subject of the telephone call Bruce [Williamson] placed to you." Williamson also emailed Shelby that night, saying, "Hope this helps." The July 23 Board resolution established an escrow account for "all authorized advances of . . . attorney's fees incurred by Foster and Olis" to hold the funds in escrow until the Board made its "good faith" determination. Williamson testified that because Olis was a former officer, Dynegy could not simply stop paying his legal fees under its bylaws and articles; the most Dynegy could do in order to more fully cooperate with the government was to escrow the legal fees until the Board made a determination whether Olis had met the "good faith" standard for indemnification under the articles. The Board ultimately determined that Olis had not acted in good faith, and had engaged in unlawful conduct while employed at Dynegy, and refused to pay the escrowed $448,556 in fees.

**Standard of Review**

When an appellant challenges the legal sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof, the appellant must show there is no evidence in the record to support the finding in order to prevail on appeal. *City of Pasadena v. Gennedy*, 125 S.W.3d 687, 691-92 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). In reviewing the legal

sufficiency of the evidence to support the finding of fraud, we consider all the evidence in the record in the light most favorable to the jury's verdict, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Formosa*, 960 S.W.2d at 48.

Here, application of that standard, which requires us to view all the evidence in the light most favorable to the verdict, means that we must credit Yates' testimony that he had a conversation with Cracraft on June 20, 2003 because a reasonable juror could have believed Yates' testimony and disbelieved Cracraft's testimony that no conversation occurred. *City of Keller*, 168 S.W.3d at 807.

**Applicable Law**

To establish a common law fraud cause of action, a plaintiff must prove (1) a material representation was made, (2) which was false, (3) which was either known to be false when made or which was recklessly made as a positive assertion without knowledge of its truth, (4) which the speaker made with intent that it be acted upon, and (5) the other party took action in reliance upon the misrepresentation, and (6) thereby suffered injury. *Formosa*, 960 S.W.2d at 47; *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001). A contractual promise made with no intention of performing may give rise to an action for fraudulent inducement. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006). A promise of future performance may form the basis of a fraud claim if the promise was made with no intention of performing at the time the promise was made. *Formosa*, 960 S.W.2d at 48. Mere breach of a contract does not constitute evidence that the party did not intend to perform; however, "breach combined with 'slight circumstantial evidence'

-18-

of fraud" constitutes some evidence of fraudulent intent and is legally sufficient to support a verdict. *Tony Gullo Motors*, 212 S.W.3d at 305. Evidence must be presented that a representation was made with the intent to deceive, and with no intention of performing as represented, at the time the representation was made. *Formosa*, 960 S.W.2d at 48; *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). The speaker's intent at the time of the representation may be inferred from the speaker's subsequent acts after the representation was made. *Spoljaric*, 708 S.W.2d at 434.

**Analysis**

In the charge, the jury was asked to answer the general broad-form question, "Did Dynegy Inc. commit fraud against Yates?" The jury was instructed on the basic elements of two fraud theories—fraud by misrepresentation and fraud by omission of a material fact. The jury was further instructed that a "misrepresentation" means either a false statement or "a promise of future performance made with an intent not to perform as promised." The jury answered in the affirmative. In his brief, Yates argues the jury finding of fraud should be upheld because there is sufficient evidence of fraudulent inducement based on the June 20, 2003 oral agreement, disclaiming reliance on the August 13, 2003 escrow letter and the non-disclosure theory. Yates argues that the fraud was "in the misrepresentation that Dynegy would pay the legal bills directly to Yates as incurred." Dynegy argues there is "no evidence" of fraudulent inducement in connection with the June 20, 2003 oral fee agreement because: (1) the same corporate speaker must make the promise and possess the intent not to perform for the corporation to have committed fraud; (2) subsequent events may not be used to prove intent not to perform at the time of the promise; (3) mere inferences and speculation, without more, are not evidence of fraud; and (4) Yates did not prove his actual, justifiable reliance on the misrepresentation.

### *1. "Mixing and Matching" Fraud Elements – Different Corporate Actors*

Dynegy asserts there is "no 'mix and match' theory of fraud" in which one corporate actor of Dynegy could make the oral promise and another corporate actor could possess the intent not to perform. It concedes that corporations act through their officers, directors, employees and agents, and agrees that Dynegy was acting through Cracraft on June 20, 2003.[3] Dynegy stresses, however, that the record contains no evidence that Cracraft made the oral promise on June 20, 2003 with a conscious intent not to perform as promised. Dynegy argues the only possible evidence of an intent not to perform by a Dynegy agent is the CEO Williamson's July 2003 statement that he had wanted to modify Dynegy's fee advancement policy for the past six months. It argues the jury's fraud finding against Dynegy cannot be supported by "mixing and matching" the oral promise by Cracraft and the intent not to perform by Williamson.[4]

Dynegy asserts that Yates had to prove that the same corporate representative of Dynegy who made the oral promise also had the requisite fraudulent intent at the time of the promise. It contends that the subjective intent and/or knowledge of several corporate actors cannot be combined, or "mixed and matched," to satisfy the scienter requirement of fraud. In support, Dynegy relies primarily on a Fifth Circuit securities fraud case holding that to determine whether a statement by the corporation was made with the requisite scienter, the appropriate focus is on the state of mind of the individual corporate official who made the statement rather than on the collective knowledge

---

[3] The jury was instructed that corporations act through their officers, directors, employees and agents.

[4] It is undisputed that the corporate representative who made the oral fee agreement on June 20, 2003 was Cracraft. There is likewise no contention, and no evidence in the record, that the CEO Williamson ever spoke to Terry Yates or Mark Clark about the Olis fee arrangement.

of all the corporation's officers and employees. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (citing *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995), for proposition that "there is no case law supporting an independent 'collective scienter' theory"). The Fifth Circuit reasoned,

> This is consistent with the general common law rule that where, as in fraud, an essentially subjective state of mind is an element of a cause of action also involving some sort of conduct, such as a misrepresentation, the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual on general principles of agency.

*Id.* (citing RESTATEMENT SECOND, Agency § 275, cmt. b; § 268, cmt. d (1958)). The Fifth Circuit in *Southland* relies on several other circuit and federal district court opinions similarly rejecting a "collective scienter" concept for corporations in the context of fraud actions. *See id.* at 366-67; *see, e.g.*, *Woodmont, Inc. v. Daniels*, 274 F.2d 132, 137 (10th Cir. 1959) ("while in some cases, a corporation may be held constructively responsible for the composite knowledge of all of its agents, . . . we are unwilling to apply the rule to fix liability where, as here, intent is an essential ingredient of tort liability as for deceit"); *In re Apple Computer, Inc. Sec. Litig.*, 243 F.Supp.2d 1012, 1023 (N.D. Cal. 2002) ("It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false. A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement."); *Gutter v. E.I. Dupont De Nemours*, 124 F.Supp.2d 1291, 1311 (S.D. Fla. 2000) ("The knowledge necessary to form the requisite fraudulent intent must be possessed by at least one agent and cannot be inferred and imputed to a corporation based on disconnected facts known by different agents."); *United States*

*v. LBS Bank-New York, Inc.*, 757 F.Supp. 496, 501 n.7 (E.D. Pa. 1990) ("Although . . . a corporate defendant is considered to have acquired the collective knowledge of its employees . . . specific intent cannot be aggregated similarly."); *First Equity Corp. of Florida v. Standard & Poor's Corp.*, 690 F.Supp. 256, 260 (S.D. N.Y. 1988), *aff'd*, 869 F.2d 175 (2d Cir. 1989) ("While . . . a corporation may be charged with the collective knowledge of its employees, it does not follow that the corporation may be deemed to have a culpable state of mind when that state of mind is possessed by no single employee. A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual."). *Accord Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008). Dynegy also relies on the Texas Supreme Court's holding in *FirstMerit* for the general fraud requirement that "when the representation was made, the *speaker* knew it was false or made it recklessly without any knowledge of the truth . . . [and] the *speaker* made the representation with the intent that the other party should act upon it." *In re FirstMerit*, 52 S.W.3d at 758 (emphasis added).

Yates briefly responds by arguing that under Texas law, a corporation can only act through its agents and the fraudulent intent of a corporate officer or agent acting with actual or apparent authority can be imputed to the corporation. *See NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 952-53 (Tex. 1996); *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995). Yates also asserts that the two federal circuit cases relied on by Dynegy, *Southland* and *Makor*, are federal securities fraud cases and thus distinguishable. However, *Southland* cites and relies on several types of fraud cases for its reasoning that there is no "collective scienter" concept for corporations. *See Southland*, 365 F.3d at 366-67 (internal citations omitted). Moreover, as noted by Dynegy in its reply brief, the reasoning used in *Southland* is based on the traditional common law rules of agency. *See id.* at 366;

*see also Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533-34 (5th Cir. 2008) (reaffirming *Southland*).

Dynegy is correct that the same corporate agent must commit all the elements of fraud before the corporation may be held liable for the fraud. Therefore, Williamson's statements in July 2003 that he had the desire and intent to stop paying Olis' legal fees for the past six months cannot be combined with Cracraft's oral promise on June 20, 2003 in a "mix and match" method of fulfilling all the elements of fraud. Therefore, since Cracraft was the corporate speaker who made the oral agreement with Clark/Yates, it is her knowledge and intent that is at issue.

### 2. Intent: Subsequent Events After Formation of Oral Contract

Dynegy argues that "the essential facts at the core of the Plaintiff's complaint occurred after formation of the alleged oral agreement – meaning they cannot constitute fraudulent inducement." Specifically, it asserts that Williamson testified the U.S. Attorney first pressured Dynegy to stop paying its officers' legal fees on July 15, 2003, and Dynegy's Board passed the resolution setting up the escrow procedure on July 23, 2003; because these events occurred one month *after* formation of the oral contract on June 20, 2003, it contends they do not constitute any evidence of fraudulent intent at the time of the oral contract. In support, Dynegy cites *Formosa* for the basic proposition that it is the party's intent at the time the representation is made that is determinative. *Formosa*, 960 S.W.2d at 48. The law is equally clear, however, that intent at the time of the representation may be inferred from the speaker's subsequent acts after the representation. *Spoljaric*, 708 S.W.2d at 434; *Oliver v. Rogers*, 976 S.W.2d 792, 804 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). A failure to perform a future act as promised is fraud only when there was no intent to perform the act at the time the promise was made. *Oliver*, 976 S.W.2d at 804. "[O]therwise, every breach of

contract would involve fraud." *Id.* (noting the distinction between cases involving a promise made without any intention to perform from a promise made with intent to perform but the promisor changes his mind and refuses to perform).

Here, the oral contract was formed on June 20, 2003 during the conversations between Clark and Cracraft, and Yates and Cracraft. Therefore, the key inquiry is whether there is any evidence that Cracraft had no intent to perform on June 20, 2003 when she made the oral promise that Dynegy would directly pay Olis' legal fees. *See Formosa*, 960 S.W.2d at 48. The parties' discussion about subsequent events being used to show intent at the time of the agreement centers on the email exchange between Williamson and Shelby, which occurred primarily in July 2003—one month after the agreement. Given the law, discussed *supra*, that it is the individual corporate speaker whose intent must be determined, the subsequent actions by Williamson may not be used to infer Cracraft's subjective intent or knowledge on June 20. Yates points to no actions by Cracraft herself after June 20 from which an intent not to perform the oral fee agreement may be inferred.

Yates argues there is other evidence, including, for example, the January 2003 Assistant U.S. Attorney letter about "apparent cooperation" and other emails between Williamson and Shelby, showing the need for additional cooperation by Dynegy was under discussion *before* the June 20, 2003 oral fee agreement. Absent some evidence on which to base an inference that Cracraft knew about these discussions, that evidence does not support an intent not to perform by Cracraft at the time of the June 20, 2003 oral fee agreement.

### 3. Only Inferences and Speculation – Cracraft's Fraudulent Intent

Dynegy asserts there is no evidence in the record to support a finding that Cracraft, as the corporate speaker who made the oral fee agreement, had the intent not to perform the oral contract

at the time she made it. *See FirstMerit*, 52 S.W.3d at 758. It contends that Yates' theory of fraud is mere inference stacking and thus cannot support the verdict.

Yates stresses that, when combined with Dynegy's breach of the oral contract, only "slight circumstantial evidence" of fraud is required to support the jury's finding of fraudulent intent by Dynegy. *See Huynh*, 2007 WL 495023, at *4 (holding slight circumstantial evidence of fraud in combination with failure to perform as promised was legally sufficient to support finding of fraudulent intent). Yates argues that there is "an abundance of circumstantial evidence" of Dynegy's fraudulent inducement on June 20, 2003. To support an inference of Cracraft's fraudulent intent not to perform the June 20, 2003 oral contract, Yates points primarily to Cracraft's knowledge of the Thompson Memo's cooperation requirements in May 2003, her drafting of the May 2003 letter cutting off Sharkey's legal fees, Williamson's July 2003 statement that he had been wanting to modify the payment of legal fees for six months, and the subsequent August 13, 2003 letter setting up an escrow procedure which Yates alleged was a scheme to disguise nonpayment as escrow.

First, the evidence is not clear that Dynegy did breach the oral fee contract. As of February 2004, Dynegy had paid Yates approximately $200,000 in legal fees for work performed prior to August 18, 2003, and only his last bill for $448,556 was still escrowed; therefore, Dynegy had partially performed the oral fee contract made by Cracraft. Cracraft's oral agreement to pay Yates' legal fees was premised on the October 2002 Board resolution and Olis' signed undertaking. The October 2002 resolution approving the payment of Olis' legal fees contains language permitting Dynegy's Board to modify or revoke that approval "at any time as a result of changes in circumstances or further analysis." Thus, the Board retained broad authority and discretion to modify the terms of the Olis fee payments, or even to revoke the payments entirely, at any time based

on any "change in circumstances" or "further analysis." Williamson testified that both of those events occurred because the Board learned that Olis had stopped cooperating with the government's investigation as required by his signed undertaking, and additional evidence had arisen that caused the Board to suspect that Olis had known that Project Alpha was illegal and had acted unlawfully and "not in the best interest" of the corporation. Therefore, according to Williamson, the Board determined that Olis' fees should be escrowed as permitted by Dynegy's articles of incorporation, instead of paid directly to Yates, until the Board could make a final determination as to Olis' good faith and lawful or unlawful actions.

Second, the trial evidence does not support a reasonable inference that Cracraft had any intent not to perform as promised at the time she made the oral fee agreement on June 20, 2003. As to the June 20, 2003 oral conversation between Cracraft and Clark, both testified that Cracraft said that Dynegy was paying the fees for Olis and to just send her the bill. Clark stated she said the legal fees were being paid pursuant to the Board resolution, while Cracraft stated she said the fees were being paid pursuant to Olis' undertaking. As to the conversation between Cracraft and Yates, she stated it did not occur, while Yates stated she confirmed that Dynegy would pay the Olis legal fees directly to Yates through trial. There is no evidence that Cracraft had any knowledge of Williamson's desire to cut off the payments of legal fees to the officers under investigation at the time she made the June 20, 2003 oral agreement. Yates argues that Cracraft had to be aware of the pressure being put on Dynegy by the U.S. Attorney to cut off payment of the legal fees, and that, at a minimum, an inference can be drawn that Cracraft knew of the government's pressure to cut off legal fees on June 20, 2003 when she made the oral contract with Yates. However, there is no evidence in the record from which such an inference can reasonably be drawn. Cracraft admitted being aware of the

Thompson Memo's general cooperation requirements in May 2003, but not specifically with respect to payment of legal fees for officers/employees. Cracraft also admitted that she wrote the May 2003 letter to Sharkey cutting off her legal fees, but stated that she did not know the reason for the letter and was merely instructed to draft the letter by her supervisor; she later explained that Sharkey was different from Olis because she was not an officer. Further, Cracraft testified that on June 20, 2003 she had no knowledge of Williamson's desire or intent during the six months prior to July 2003 to modify or cut off the payment of the officers' legal fees. In addition, Cracraft repeatedly told Clark when he inquired about payment of the outstanding fee bills that she had no involvement with the Board, and "did not know" exactly how the July 2003 escrow resolution changed the payment procedure or when, or if, Yates would be paid.

Based on the foregoing, we conclude the evidence is legally insufficient to support the judgment based on fraud because there is no evidence that supports a reasonable inference that Cracraft had the intent not to perform at the time she made the June 20, 2003 oral fee agreement.[5] Without the fraud finding, there is no basis for the award of exemplary damages. Accordingly, we reverse the trial court's judgment, including its award of exemplary damages, and render a take nothing judgment against Yates on his fraud claim.

**YATES' CONDITIONAL CROSS-POINT**

Yates raises a conditional cross-point in the event this Court reverses the judgment based on fraud. Specifically, he elects recovery under contract and asserts this Court must render judgment in his favor on the jury's breach of contract findings. When a judgment is reversed on appeal on one

---

[5] In its appellant's brief, Dynegy limits its last sufficiency argument, that there is no evidence of actual or justifiable reliance by Yates, to the written escrow letter. Yates waived any reliance on the August 13, 2003 escrow letter as a separate basis of fraud in his appellee's brief. Accordingly, we need not reach this issue.

theory of recovery, a party may seek recovery under an alternative theory that the jury found in its favor at the trial court level. *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 274 (Tex. 1995); *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988). Here, in addition to the favorable jury finding on fraud, Yates also received an affirmative finding on his breach of contract claim.

As an initial matter, Yates asserts that Dynegy has waived any error in the breach of contract findings by failing to include such an issue in its appellant's brief. We disagree. Yates moved for judgment seeking damages under his fraud theory, and the final judgment was rendered on that theory. *See id.* Therefore, to reverse the judgment on appeal, Dynegy was only required to challenge the specific grounds upon which the judgment was based. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996) (courts of appeals should consider all grounds the trial court rules on and the movant preserves for appellate review that are necessary for final disposition of the appeal). Dynegy did not waive its right to assert alternative grounds denying Yates recovery in the event, as here, we reverse the judgment on the fraud theory. *See Oak Park Townhouses v. Brazosport Bank of Tex., N.A.*, 851 S.W.2d 189, 190 n.3 (Tex. 1993) (per curiam) (citing *Chesshir v. First State Bank of Morton, Tex.*, 620 S.W.2d 101, 102 (Tex. 1981)) (party must raise the alternative grounds for denying recovery in the court of appeals, either in its reply brief or on motion for rehearing). Here, Dynegy responded to Yates' conditional cross-appeal in its reply brief, arguing that Yates is not entitled to judgment on the breach of contract theory. Therefore, Dynegy has not waived its right to challenge Yates' recovery under the alternative contract theory.

In its reply brief, Dynegy contends Yates is not entitled to judgment on the breach of contract claim because: (1) "the fraud theory so infused the courtroom that reversal of that claim would

require a new trial on the contract claim;" (2) the trial court abused its discretion in admitting PX 93, which was harmful hearsay; and (3) reversal of the fraud judgment would require a new trial on attorney's fees for the breach of contract claim.[6]  First, Texas Rule of Appellate Procedure 38.1 requires an appellant's brief to "contain a clear and concise argument for the contention made, with appropriate citations to authorities and to the record."  TEX. R. APP. P. 38.1(i).  Dynegy has waived its "fraud theory so infused the courtroom" argument because its brief lacks any citations to the record and any supporting legal authority for its one-sentence argument.  *See Nguyen v. Kosnoski*, 93 S.W.3d 186, 188 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

Second, Dynegy argues the trial court abused its discretion in admitting, over Dynegy's objection, a handwritten post-it note marked as trial exhibit PX 93.  The note states, "ASAP 6-20 FAX K TO DYN FOR FINAL APPROVAL ATTN: CRACRAFT.  CALL FOR FAX # . . .  BILL DYN NOT CLIENT. DYN TO PAY FEES & EXPENSES PER K CRACRAFT."  Yates testified this post-it note was attached to his fee agreement, which was faxed to Cracraft and was the subject of their conversation on June 20, 2003.  Dynegy contends that Yates used this post-it note to win the "he-said, she-said" swearing match over whether a conversation between Yates and Cracraft occurred—in other words, to prove the truth of the matter asserted; therefore, the admission of the note was harmful error requiring reversal and a new trial on the contract claim.  To obtain a new trial based on the alleged evidentiary error, Dynegy must prove the error probably resulted in an improper judgment, that is, that the jury's findings on breach of contract turned on the post-it note.  *See City*

_____

[6] Dynegy also references the "erroneous jury instruction on advancement" as requiring a new trial; however, Dynegy's discussion of the advancement instruction in its appellant's brief relates entirely to the escrow fraud theory which has been waived by Yates; further, Dynegy's brief clearly presents it as a contingent issue, dependent on this Court finding sufficient evidence to support the jury's fraud finding which we have not done.

*of Brownsville v. Alvarado*, 897 S.W.2d 750, 753-54 (Tex. 1995). Our review of the entire record shows the post-it note is cumulative of the trial testimony given by Clark and Cracraft in which they both stated that during their phone conversation on June 20, 2003 Cracraft told Clark that Dynegy was paying Olis' legal fees and to submit the bills directly to her. Dynegy asserts the note necessarily corroborated Yates' testimony about his conversation with Cracraft (which she denied) during which he confirmed her receipt of the faxed fee agreement. Given that it is the jury's role to resolve conflicts in the evidence and to assess the credibility of the witnesses and the weight of their testimony, we may not substitute our judgment for that of the jury's. *City of Keller*, 168 S.W.3d at 819. Viewing the note in the context of the entire trial record, we cannot say the jury's favorable findings on the contract theory turned on the admission of the post-it note; any error in the admission of PX 93 was harmless. *See Alvarado*, 897 S.W.2d at 753-54.

Finally, Dynegy's argument that if judgment is rendered on the contract claim, a new trial will be required on attorney's fees similarly fails. First, Dynegy cites us to no authority requiring a new trial on attorney's fees when one theory of recovery is reversed and judgment is rendered on an alternative theory on which favorable findings were also returned. The two cases cited by Dynegy involve remand for a new trial on attorney's fees based on a reduction in damages on appeal under a single theory of recovery. *See Barker v. Eckman*, 213 S.W.3d 306, 313-15 (Tex. 2006); *Young v. Qualls*, 223 S.W.3d 312, 314-15 (Tex. 2007) (per curiam). In those cases, the Supreme Court held that because it could not be reasonably certain that the erroneous damages award did not significantly affect the fact finder's consideration of the "results obtained" factor under the *Arthur Andersen* analysis, a new trial on attorney's fees was required. *See Barker*, 213 S.W.3d at 314-15; *Young*, 223 S.W.3d at 314-15 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.

1997)). Those cases are distinguishable, however, because here the damages being reversed are for fraud, a claim for which no attorney's fees are recoverable; therefore, there is no risk the jury was affected by an erroneous amount of damages in calculating the reasonable attorney's fees recoverable on the contract claim. At trial, counsel for Yates presented evidence as to the legal work performed on the contract claim, segregated from the fraud claim, as required. *See Tony Gullo*, 212 S.W.3d at 313-14. In Question No. 6, the jury made specific findings on the amount of necessary legal services attributable solely to Yates' contract claim, finding that $574,718 in fees were incurred through trial and post-trial; the jury further found that conditional appellate fees were $125,000 for an appeal to the Court of Appeals, $25,000 for filing a petition for review in the Texas Supreme Court, and $35,000 if the Supreme Court granted review. We conclude that judgment may properly be rendered in favor of Yates on his breach of contract claim as well as for recovery of attorney's fees under the contract claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008).

## CONCLUSION

Based on the foregoing analysis, we reverse the trial court's judgment based on the jury's fraud findings, including its award of exemplary damages, and render a take-nothing judgment against Yates on the fraud claim. Because the jury also returned favorable findings on Yates' alternative breach of contract theory, and Yates seeks recovery under that alternative theory, we render judgment in favor of Yates based on the jury's breach of contract findings and award Yates actual damages of $448,556, plus prejudgment and post-judgment interest. Further, based on the jury's findings as to the reasonable and necessary attorney's fees recoverable for the breach of

contract claim, we award Yates $699,718 in trial, post-trial and appellate attorney's fees, plus $60,000 in conditional appellate fees.


Phylis J. Speedlin, Justice